IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| STEPHEN KNIGHT,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>ST. ALPHONSUS REGIONAL,<br>MEDICAL CENTER,<br><br>　　　　　　　Defendant. | CASE NO. CV 04-004-S-MHW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

Defendant Saint Alphonsus Regional Medical Center, Inc. ("Saint Alphonsus") employed Plaintiff Stephen Knight ("Knight") from 1974 until he was terminated on June 21, 2004 at the age of fifty-three. In August of 2003, Knight filed this lawsuit in the District Court of the Fourth Judicial District of the State of Idaho, alleging Saint Alphonsus violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") and the Older Workers Benefit Protection Act ("OWBPA"). Saint Alphonsus removed the case to this Court in January 2004. Currently before the Court for its consideration is Defendant's Motion for Summary Judgment (Docket No. 30), May 11, 2005.

In filing this summary judgment motion, Saint Alphonsus maintains no genuine issue of material fact exists with respect to Knight's claims under the ADEA and the OWBPA as Knight has allegedly admitted, contrary to the allegations in his Complaint, that neither his age nor his proximity to retirement influenced Saint Alphonsus's decision to terminate his employment. Alternatively, Saint Alphonsus maintains Knight failed to establish a *prima facie* case of age discrimination, or, at the very least, Saint Alphonsus contends that it has articulated legitimate, non-discriminatory reasons for terminating Knight that are not a mere pretext for age discrimination.

While Knight now concedes he has no claim under OWBPA, he contends he has established a prima facie case of age discrimination. Knight further contends that he has submitted sufficient evidence from which a reasonable jury could infer that the legitimate, non-discriminatory reasons articulated by Saint Alphonsus for his termination are merely a pretext for improper age discrimination. This is based in large part on Knight's contention that all of the reasons articulated by Saint Alphonsus for his termination predated his being "rehired" into a new position in the soon to be re-organized Purchasing Department. In addition, he argues his supervisor only cited one particular incident as the reason for his termination while never mentioning the other alleged reasons until this suit was filed. The Court heard oral argument on July 7, 2005. Having considered all the evidence and briefing submitted, the Court will grant summary judgment in favor of Saint Alphonsus.

## I.
## Background

Saint Alphonsus hired Knight as a storeroom clerk in 1974. Throughout the next twenty-seven years, Knight worked in various positions in the hospital's Purchasing Department until he

was terminated from his position as a Senior Buyer in June 2002. In the two years leading up to his termination, the Purchasing Department experienced a series of reorganizations and changes in management. Knight's direct supervisor at the time of his termination, Jan Ferdon, was the third supervisor in two years–Knight's previous two supervisors had each stayed for less than a year.

Before Ferdon, Fred Stokes held the position of Director of the Material Management (Purchasing Department) and was Knight's direct supervisor. When Stokes arrived, as part of a general re-organization, he redesigned Knight's position, downgrading Knight from his former position as Purchasing Coordinator at Saint Alphonsus to Senior Buyer. As part of the downgrade, Knight received a reduction in compensation, and his supervisory, staffing and budgeting responsibilities disappeared. Stokes also noted some problems with Knight's job performance. In June of 2001, Stokes conducted the standard "Competency Assessment" for Knight's. Stokes rated Knight a "zero" on a scale of "zero" to "four" in one performance category and a "one" in eight performance categories. Initially, Stokes had rated Knight a "zero" in several other categories relating to technical competency, but Knight convinced Stokes to raise his score to a "one."[1]

In addition to giving Knight some lower scores in his performance evaluation, Stokes also issued a verbal and written warning in relation to an incident which occurred in June 2001. Apparently, Stokes believed Knight had revealed a bid of a vendor to its competitor. Stokes met with Knight and explained to him that disclosing one vendor's price to a competing vendor was

---

[1] According to the Competency Assessment Rating Scale, a "zero" signifies that the employee "does not perform." A "one" means the employee "verbalizes understanding and performs with supervision, a "two" means the employee "performs well with minimal assistance," while a "three" means the employee "consistently performs independently" and a "four" signifies the employee "serves as an expert, mentor, and role model."

**Memorandum Decision and Order - Page 3**

unethical. (Ex. F to Ferdon Aff.) Knight, recounting his version of the events, insists that he never revealed the "bid price" to a competing vendor; rather, he states that he only asked the other vendor if it would meet a certain price point, which just so happened to be the bid of the competitor. He states that once Fred Stokes issued a written warning, it was never an issue again, nor was it ever mentioned until after he filed his claim.

In January of 2002, Jan Ferdon replaced Stokes as the Director of Materials Management and became Knight's direct supervisor. Within three months of her arrival, Ferdon also completed the standard "Competency Assessment" with respect to Knight's job performance. In his "Competency Assessment," Knight received a score of one out four in several job performance categories, mainly related to his technical abilities. Although Knight maintains he was performing satisfactorily on the date he was terminated, Ferdon testified in her affidavit that she had significant concerns with respect to his performance. Specifically, she testified that Knight "approached his job in a lackadaisical manner, failing to cooperate with [her] and displaying a lack of concern regarding the quality of his job performance." (Ferdon Aff. ¶ 3.) In addition to her general concerns regarding Knight's attitude and technical competency, Ferdon also testified that she "lacked confidence in Mr. Knight's ability to adequately carry out the duties of his position as Senior Buyer." (Ferdon Aff. ¶ 3.) Ferdon detailed several incidents, which she believes demonstrated Knight's inability to respond adequately or appropriately to several issues arising in the Purchasing Department.

The first incident that Ferdon mentioned has been identified by Knight as the so-called "Philips incident." According to Ferdon, the Saint Alphonsus's Vice President of Finance, Ken Fry, approached her in mid-May 2002 regarding a situation in which Knight had approved

**Memorandum Decision and Order - Page 4**

payment to Philips Medical Systems on two invoices based on a single receipt on a purchase order. Upon further investigation, Ferdon learned that Knight had issued a manual purchase order, rather than a computer-generated purchase order, for several monitors for the Neonatal Intensive Care Unit. Knight approved payment initially on the manual purchase order in December 2001. Knight then approved payment on a duplicate invoice that the vendor inadvertently sent to Saint Alphonsus for the same order in March 2002. Because of Knight's approval, Saint Alphonsus could have paid Philips an additional $129, 494.40 as that was the amount of the purchase order. However, Philips noticed the error and notified the hospital. Ferdon informed Knight that he should no longer issue manual purchase orders. When confronted, Knight explained that he had entered the purchase order manually because of the complexity of the transaction. (Knight Aff. ¶ 6.) Knight also asserts that when Ferdon reviewed the invoices, she acknowledged that it was not entirely his fault. (Knight Aff. ¶ 7.) Knight believed the issue was resolved. *Id.*

Ferdon asserts that her frustration with Knight escalated when she discovered in late May 2002 that he had committed over one million dollars of the hospital's money by signing an agreement for services. (Ferdon Aff. ¶ 4C.) By signing the agreement without Ferdon's approval, Knight directly contravened a written notice that she had sent to all the staff in the in the Purchasing Department, instructing them to send all important documents to her for signature. *Id.* In defense of his actions, Knight states he signed the purchase order because it had already been approved at the corporate level, so he did not believe it was outside the scope of his responsibility. (Knight Depo. at 115.) Knight acknowledged that Ferdon seemed upset by his

**Memorandum Decision and Order - Page 5**

actions, but maintains that he explained to her why he did and she never mentioned it again. (Knight Depo. at 116-117.)

Ferdon also became upset when Knight failed to submit in conjunction with an upcoming evaluation, an action plan for the future on how he could improve his overall performance. Ferdon had instructed Knight to submit the plan by May 15, 2002, which he did not do until May 30, 2002, after Ferdon reminded him. (Ferdon Aff. ¶ 4(D).)  At that time, Knight did e-mail Ferdon a "plan," but she testified it was insufficient because it did not delineate his goals and objectives and was not specific enough as to how he planned to improve his computer skills. *Id;* (Ex. F to Ferdon Aff.)  Knight purports that he did not include his goals and objectives because Ferdon was in the midst of reorganizing the Purchasing Department and had not announced the new positions. Therefore, Knight did not know what his new position would be and could not submit his goals and objectives without this information. (Knight Aff. ¶ 11.)

Excluding the two incidents which occurred in May 2002, Ferdon was aware of Knight's issues when she opted to interview him for the position of Purchasing Agent in the reorganized department after sending out an e-mail in late April 2002, requesting those employees interested in working in the reorganized department to submit applications.  She testifies that she initially decided to permit Knight to fill the position of Purchasing Agent after interviewing him in April. (Ferdon Aff. ¶ 6.)  On June 4, 2002, Ferdon announced the hiring decisions for the new positions in the department.  (Knight Aff. ¶ 12.)  The following day, Knight sent an e-mail to the Human Resources Department inquiring about where he would fall on the pay scale in the newly reorganized department.  (Knight Aff. ¶ 13.)  He received a reply informing him of his pay scale. *Id;* (Exhibit B to Knight Aff. ¶ 13.)

**Memorandum Decision and Order - Page 6**

Without citing a reason why she initially decided to hire Knight as a Purchasing Agent in the newly reorganized department, Ferdon terminated Knight's employment on June 21, 2002, abducing the "Philips" incident and Knight's failure to submit a performance plan as the reasons for her decision. (Knight Aff. ¶ ) Since Knight filed the IHRC claim, Ferdon has identified the other incidents as additional reasons for his termination. Ferdon did not fill Knight's position as Senior Buyer, but did hire two younger workers as Purchasing Agents to fill the void.

Knight believes he was terminated because he was older and, as a result, he would cost Saint Alphonsus more in salary and retirement benefits because those benefits varied with both age and years of service. (Knight Aff. ¶ 14.) Knight bases this belief on Ferdon's alleged statement that she wanted to replace older workers with younger, cheaper ones. (Knight Aff. ¶ 14.) As a result of this belief, Knight filed this age discrimination claim.

## II.
## Standard of Review

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (1993). A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations of denials of his pleadings." *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id*. at 249-250. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe*, 633 F.2d 531 (9th Cir. 1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992).

> In order to withstand a motion for summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with

**Memorandum Decision and Order - Page 8**

>more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

## III.
## Discussion

Saint Alphonsus urges the Court to grant summary judgment in its favor based on its contention that Knight has explicitly admitted that his age did not play a role in Ferdon's decision to terminate his employment.  Saint Alphonsus further argues, even disregarding Knight's purported admission, summary judgment should be granted in its favor because Knight has failed to establish the third prong of his *prima facie* case of age discrimination–that he was performing his job in a satisfactory manner.  In the alternative, Saint Alphonsus asks the Court to find that no genuine issue of material fact exists as to whether Saint Alphonsus had "several" legitimate, nondiscriminatory reasons for its decision to terminate Knight's employment–all relating to his alleged unsatisfactory job performance, none of which were pretextual.

In reply, Knight suggests that Saint Alphonsus has mischaracterized his deposition testimony as an admission that Ferdon did not terminate him because of his age.  Knight further maintains he performed his job in a satisfactory manner and claims he has at least raised a genuine issue of material fact as to whether Saint Alphonsus' reasons are a pretext for age discrimination because all the alleged incidents leading to his being fired occurred before he was "rehired," and because Ferdon never mentioned, either orally or in writing,  any of the reasons now articulated by Saint Alphonsus, aside from the so-called "Philips incident," when he was terminated.

**Memorandum Decision and Order - Page 9**

**A. ADEA**

The ADEA provides that it shall be unlawful for an employer to discharge or otherwise discriminate against an employee "because of ... age."  29 U.S.C. § 623(a). To prove discrimination because of age, a plaintiff must introduce evidence from which a reasonable jury could conclude, in light of common experience, that it was more likely than not that the employer's adverse action was motivated by consideration of the plaintiff's age. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579-80 (1978) (showing violation of Title VII of Civil Rights Act of 1964 requires "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations"); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ( "The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff") (quotations omitted); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) (plaintiff's burden under Title VII is to demonstrate that defendant's proffered explanation for an adverse employment action is more likely than not a pretext for discrimination).[2]  In evaluating age discrimination claims, the courts employ the familiar burden-shifting analysis as developed in  *McDonnel Douglas* at the summary judgment stage.  *See Pottenger v. Potlatch Corp.,* 329 F.3d 740, 745 (9th Cir. 2003).

---

[2] Congress designed the ADEA's discrimination prohibitions to parallel those found in Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 1. 42 U.S.C. § 2000e et seq. *See Lorillard v. Pons*, 434 U.S. 575, 584 (1978). Accordingly, principles of construction under Title VII are routinely applied in ADEA cases. *See Oscar Meyer Co. v. Evans*, 441 U.S. 750, 755-58 (1979) (noting that, where provisions of ADEA are virtually *in haec verba* with Title VII, construction of ADEA in accordance with interpretations under Title VII serves Congressional intent). See generally 3A Larson, Employment Discrimination § 102.41 (1992).

To maintain an age discrimination claim, a plaintiff must produce enough evidence to establish a prima facie case of discrimination which, for purposes of summary judgment, means enough evidence to permit a trier of fact to infer the fact at issue. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir.1990). The elements of a prima facie case are that plaintiff: (1) was a member of the protected class (age 40 to 70); (2) was performing his job in a satisfactory manner; (3) was discharged; and (4) was replaced by a younger employee. *Id*. at 1421.

Once the plaintiff has established a prima facie case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the employment decision. *Id.* at 1420.  If the employer carries the burden of production, plaintiff must prove by a preponderance of all the evidence that the reasons offered by the employer were pretextual. *Id.*  Throughout the burden-shifting process, the plaintiff always carries the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.  *Douglas v. Anderson,* 656 F.2d 528 (9th Cir. 1981), *citing Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).

### 1. Knight's Purported Admission

It is undisputed that when counsel for Saint Alphonsus asked Knight during his deposition whether he believed his chronological age was a factor in his termination, he replied "I don't think my age was, but my pay was." (Knight Depo. at 95.)  Yet, Knight also stated that he believed Ferdon terminated his employment because she wanted the opportunity to develop a younger staff.  (Knight Depo. at 94-95.)  He testified further that he felt, because he was older, Ferdon found it difficult to break Knight's "old habits."  *Id.*

Based on the above statements, sound arguments exist in support of Saint Alphonsus's contention that Knight essentially conceded that he was not fired because of his age. Yet, when the deposition is viewed as a whole, Knight's statements are arguably open to interpretation. Furthermore, as a layperson, Knight is not schooled in the nuances of employment law and was not necessarily aware of the precise legal implication of his words. Therefore, rather than dismissing Knight's claim on this basis, the Court will proceed forward under the standard *McDonnell-Douglas* framework.

### 2. *Prima Facie* Case

There is some question as to whether Knight has made out a *prima facie* case of age discrimination. Saint Alphonsus does not dispute that Knight suffered an adverse employment action, i.e. he was terminated, and that Knight was in a protected age category at the time of his termination. Nor does Saint Alphonsus meaningfully dispute that Knight was replaced by someone younger than himself with equal or inferior qualifications–Knight's position of Senior Buyer has not been filled, but Saint Alphonsus has instead hired two individuals as Purchasing Agents for the reorganized Purchasing Department. Yet, Saint Alphonsus asserts that substantial evidence exists in the record supporting its contention that Knight was not performing his job in a satisfactory manner during the twelve months leading up to his termination.

Knight received some low scores relating to his technical capabilities on Competency Assessment from both Fred Stokes and Jan Ferdon. It is also undisputed that Knight received reprimands for incidents occurring in June 2001 and January 2002–namely, allegedly disclosing a competitor's bid pride to a competing vendor and signing a purchase order without Ferdon's express approval in direct contravention of her instructions that she sign all important

**Memorandum Decision and Order - Page 12**

documents. Furthermore, in May 2002, Ferdon discovered Knight had approved duplicate payments for over $100,000 on the same purchase order. Ferdon had also asked Knight to supply a list of goals and objectives that same month, which he failed to do. While Knight does not deny that these incidents occurred, he does not assign the same import to them as does Saint Alphonsus.

Although Saint Alphonsus has submitted convincing evidence revealing some inadequacies in Knight's job performance, applying the relatively loose requirements for establishing a *prima facie* case, the Court cannot conclude, as a matter of law, that he was not performing his job in a satisfactory manner. In establishing a *prima facie* case, the requisite degree of proof is minimal; plaintiff need only offer evidence giving rise to an inference of unlawful discrimination. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). The Ninth Circuit does not require that Knight prove by a preponderance of the evidence that he was performing satisfactorily. *Id.* In his affidavit, Knight countered each of the alleged incidents, which Saint Alphonsus submitted as evidence of his inadequate job performance, with a reasonable explanation of how and why they occurred and their resolution.

Specifically, Knight alleges that in the three years preceding his termination, during which Saint Alphonsus contracted with at least three different consultants to reorganize its operations, he was given three different performance evaluations, none of which indicated any deficiencies in his work performance that would have led to any form of disciplinary action, nor was he informed of any danger of disciplinary actions. He further alleges that the "Competency Assessment" he received from Ferdon, when compared to his previous evaluations and performance improvement plans, was not unusual or different in scope from other years.

**Memorandum Decision and Order - Page 13**

Moreover, during the evaluation meeting, Knight and Ferdon agreed that Knight would develop a plan to improve his computer skills. He took an Excel class and maintains he had plans to take more. As for the alleged bid disclosure and the "Philips incident," Knight believed they were adequately resolved. At the very least, Knight has submitted sufficient evidence to create a genuine issue of material fact as to whether he was performing his job in a satisfactory manner.

While the Court finds that Knight has at least presented enough evidence regarding his *prima facie case*, it further finds that Saint Alphonsus has met its burden of articulating legitimate, nondiscriminatory reasons for terminating Knight. The burden does not rest with Saint Alphonsus to prove that just cause existed for Knight's termination. Once Knight produces sufficient evidence permitting the trier of fact to infer unlawful discrimination, then Saint Alphonsus need only respond with sufficient evidence of unsatisfactory job performance as the legitimate nondiscriminatory reason for its action. *Douglas,* 656 F.2d at 533, fn 5. Saint Alphonsus does not need to prove that Knight's inadequate job performance justified his termination, but only that its determination of his poor job performance was the real reason for the termination and not a pretext for discrimination. *Id.* Saint Alphonsus has met this evidentiary threshold and the presumption that it discriminated 'drops from the case,' and Knight must show that Saint Alphonsus' alleged reasons for his termination was merely a pretext for discrimination. *Boddett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004).

### 3. Pretext

Knight may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Raad v. Fairbanks N. Star Borough Sch. Dist.,*

**Memorandum Decision and Order - Page 14**

323 F.3d 1185, 1196 (9th Cir. 2003).  In order to survive a summary judgment motion, Knight need not produce direct evidence of discriminatory intent given a reasonable factfinder could conclude based on the *prima facie* case and the factfinder's disbelief of Saint Alphonsus's reasons for the discharge, that discrimination motivated the employment decision. *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 916 (9th Cir. 1997).

When a plaintiff relies on direct evidence to prove pretext, then he must only produce "very little" direct evidence of defendant's discriminatory intent to move past summary judgment.  Direct evidence of discrimination is "evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998).   Knight, however, has not offered direct evidence of pretext.  Therefore, he must offer "specific" and "substantial" circumstantial evidence to create a triable issue of fact as to whether Saint Alphonsus intended to discriminate. *Godwin,* 150 F.3d at 1222.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Nidds,* 113 F.3d at 916 (9th Cir. 1997) (internal quotation marks and citations omitted).

Knight first argues that Saint Alphonsus' explanation for his dismissal is unworthy of credence because all of the incidents, which serve as the alleged basis for his termination, occurred before Ferdon announced that Knight would be reassigned a Purchasing Agent in the newly reorganized Purchasing Department.  While it does seem curious that Ferdon went to the trouble of announcing that Knight would occupy the position of Purchasing Agent in the newly re-organized department and, then, a few weeks later, informed him that he was terminated, this minor timing discrepancy is not enough to undermine the legitimacy of Saint Alphonsus's articulated reasons.  Saint Alphonsus suggests that Ferdon delayed in terminating Knight

**Memorandum Decision and Order - Page 15**

because she had to obtain approval from the Human Resources Department before she informed Knight of her decision to terminate him. Knight has submitted no evidence to seriously challenge the veracity of this explanation. In fact, this explanation is more plausible than Knight's contention that Ferdon informed Knight of her decision to include him in the newly re-organized department, then a few weeks later, decided to terminate him on the basis of his age. Furthermore, Knight's "reassignment" or "rehire" by Ferdon resulted in another drop in his pay grade, suggesting his reassignment was not a mark of satisfaction with Knight's job performance.         Second, Knight argues that because Ferdon only cited the "Philips incident" as the reason for his dismissal, the other reasons which have been offered during the course of this litigation must be pretextual. However, "[s]imply because an explanation comes after the beginning of litigation does not make it inherently incredible." *Godwin,* 150 F.3d at 1222, *quoting Lindahl v. Air France*, 930 F.2d 1434 (9th Cir. 1991). The reasons Saint Alphonsus has articulated subsequent to Knight filing his lawsuit are not inconsistent with the reason offered at the time of his termination. Merely because Ferdon did not provide the full litany of Knight's alleged performance problems when she terminated him does not mean they she did not consider them when making her decision. Therefore, Knight's evidence is insufficient to raise a genuine issue of fact as to whether Saint Alphonsus's reasons for the layoff were pretextual.

     The Court has considered all of Knight's evidence of pre-text and concludes that it does not refute Saint Alphonsus's assertion that it terminated Knight because of its continuing dissatisfaction with his work performance because of his "lackadaisical attitude" and the other

enumerated incidents. The Court holds that Knight has not created a genuine factual issue of pretext. Accordingly, Knight's ADEA claim against Saint Alphonsus is dismissed.

## **ORDER**

Based upon the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that** Defendant's Motion for Summary Judgment (Docket No. 30), May 11, 2005, is GRANTED.



DATED: July 25, 2005

_____
Honorable Mikel H. Williams
United States Magistrate Judge